**Donahue Alexander FRANCIS, Plaintiff,**

v.

**CHEMICAL BANKING CORPORATION, Defendant.**

**No. 95 CV 4331 NG.**

United States District Court, E.D. New York.

Aug. 11, 1999.

Arthur L. Spirn, Korn & Spirn, Hepstead, NY, for plaintiff.

Edward O'Keefe, The Chase Manhattan Bank, Legal Dept., New York City, for defendant.

## MEMORANDUM AND ORDER

GERSHON, District Judge.

Plaintiff Donahue Francis brings this action against his former employer defendant Chase Manhattan Bank ("Chase"), alleging discrimination and hostile work environment on the basis of his race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, 42 U.S.C. §§ 2000e *et seq.*, and the New York State Human Rights Law ("HRL"), New York State Executive Law §§ 290 *et seq.;* discrimination on the basis of a disability and failure to accommodate his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112–12117, and the New York State Human Rights Law, New York State Executive Law §§ 290 *et seq.;* and intentional infliction of emotional distress. Plaintiff asserts his disability is a mental condition known as panic disorder with or without agoraphobia.

Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) to dismiss plaintiff's claims in their entirety. Defendant argues that plaintiff has failed to establish a prima facie case of discrimination or hostile work environment in violation of Title VII and the HRL, or a protected disability under the ADA. Defendant further argues that plaintiff's claim of intentional infliction of emotional distress must fail as he cannot establish the elements of such a claim. Defendant also opposes plaintiff's retaliation claim, articulated for the first time in his opposition, as procedurally barred and, alternatively, meritless as a matter of law.

### Facts

Unless otherwise indicated, the following facts are undisputed.

Plaintiff Donahue Francis is a 36 year old African–American man. Defendant Chase Manhattan Bank, then known as Chemical Bank, hired plaintiff in May 1990 as a Lundy machine operator in its MICRO Data Processing Department ("MDP Department"). The Lundy operator position requires sitting at a machine, typing microencoding strips and gluing them onto damaged checks. Throughout plaintiff's tenure as a Lundy operator, Conrad Francis, an African–American man, supervised

the MDP Department's evening shift, which included the Lundy machine operators, check sorters, and a printer operator. Conrad Francis rated plaintiff's performance as "Competent," an average rating, and in April and May 1992, issued oral and written warnings to plaintiff for remaining on bank premises after his shift. Plaintiff received two raises while working as a Lundy operator, which increased his salary by approximately 8 percent.

In January 1993, plaintiff's salary grade was increased and he was transferred to the position of printer operator. The printer operator receives, separates and delivers printouts of lists of checks to the check sorting machine operators and, when there is time, also assists the sorter operator. Plaintiff also began reporting to Gina Reis, a white woman. Ms. Reis consistently rated plaintiff's performance as "Competent" or "Commendable" in his position as printer operator. While Ms. Reis served as plaintiff's supervisor, plaintiff received at least three salary increases, which raised his salary by 20 percent.

*Allegations of Racial Harassment and Hostile Work Environment*

In early 1992, as a consequence of the merger of the Manufacturers Hanover Trust Company and Chemical Bank, Robert Mills, a white man, joined the MDP Department as a supervisor. Plaintiff alleges that beginning sometime in June 1993, Mr. Mills began to behave in an "obnoxious" manner. Plaintiff concedes that Mr. Mills behaved obnoxiously towards employees of various races and that, prior to May 1994, he did not interpret any of Mr. Mills's alleged obnoxious behavior towards him to be based upon his race or disability. Plaintiff believes, however, that beginning in 1994, "it soon became increasingly clear that my African–American heritage was the basis for his offensive harassing conduct." Francis Aff. at ¶ 4.

Plaintiff describes three specific incidents as evidence of Mr. Mills's racial harassment of him. He states that Mr. Mills told him, regarding Harry Fry Noriega, another African–American employee, "that nigger is a disgrace to all of yous." Francis Dep. at 118. Plaintiff also recalls that sometime in early 1995, in response to the distribution of United Negro College Fund brochures, Mr. Mills held up one of the brochures and stated, "why should I give money to those fucking ___ ? What have they ever done for me?" Plaintiff could not say whether Mr. Mills used the word Negroes or a racial epithet, admitting that he did not hear clearly. In March 1995, plaintiff found scribbled in pen on his desk, "All niggers should go back to Africa with a Jew under each arm," written in what he describes as "the unmistakable handwriting of Robert Mills." He believes that the comment was directed at him because he was the only black person working at that particular desk. Francis Aff. at ¶ 7.

Plaintiff further claims that Mr. Mills and Ms. Reis acted in other ways to create a racially hostile work environment. He describes Mr. Mills's racially harassing conduct as including raising his middle finger at him, slamming his hand down on plaintiff's work station while yelling "fuck you, asshole," and "you piece of shit," and eventually, stalking plaintiff and eavesdropping on his phone calls. Plaintiff also describes an instance sometime in either 1993 or 1994 when he overhead Ms. Reis saying, "Look at these fucking moolies" as she looked out into the MDP area, in which, plaintiff stated, there were numerous African–Americans. Francis Dep. at 244–45.

(Ms. Reis denies ever using the term "moolies" and states that she does not know what it means. Reis Aff. at ¶ 22. Mr. Mills admits that he has used the term "nigger" in conversation, but insists that he has never used the term in the workplace generally, nor in reference to Mr. Noriega specifically. He also denies ever following or stalking plaintiff. Mills Dep. at 17–18, 57. He received an oral counseling session from Farook Ali, an MDP Department manager, for the use of inappro-

priate, but not racial, language and was warned that he could be fired if he persisted in the use of such language. For purposes of the motion, plaintiff's account is taken as true.)

*Chase's Investigations*

In March 1994, all members of the MDP Department, including plaintiff, received and signed a notice stating that an unauthorized presence in any other department was a violation of bank policy. This notice resulted after complaints from other departments that MDP Department employees were using their telephones and offices for personal activities. On March 3, 1995, plaintiff received a written warning for violating this directive by allegedly entering an unauthorized area in another department. Plaintiff responded by going to speak with Nancy Brennan, an Assistant Vice President in Human Resources, and complaining that the warning was unfair and that he was being "targeted." Ms. Brennan met with plaintiff, Ms. Reis, Mr. Mills, and Stanley Koslowski (the Vice President responsible for all of Check Processing) on three separate occasions on March 6, 7, and 9, 1995. At these meetings, plaintiff admitted that he had been in another department, but objected to the warning as he contended that Mr. Mills had authorized him to go to the other department. Mr. Mills denied any such authorization. At the conclusion of these meetings, Ms. Brennan directed plaintiff to sign the warning with the understanding that he could respond to it in writing. Plaintiff signed the warning under protest, but did not mention race or disability in his objection.

On March 10, 1995, plaintiff told his co-worker Mr. Noriega that he was concerned that Mr. Mills might be racist. Mr. Noriega responded by telling him to raise these allegations with Chase management. Defendant states that Mr. Ali overheard this conversation and promptly relayed this information to Ms. Brennan. Defendant claims that Ms. Brennan responded immediately with another investigation, notify-ing Mr. Koslowski, Josephine Giampiccolo, and Lorraine Doyle, the Human Resources generalist responsible for the MDP Department. Ms. Brennan attempted to meet with plaintiff, who was out on vacation the week of March 13–17, 1995. It is undisputed that plaintiff contacted Staff Relations on his own on March 21, 1995, and spoke with a Janet Bevers, who also started an investigation, defendant contends, and informed Mr. Burchfield Moore, a senior level Staff Relations officer.

Mr. Moore interviewed plaintiff on March 28, 1995. At this interview, plaintiff told Mr. Moore that: 1) in 1993, Mr. Mills would mutter non-racial obscenities as he passed his work area; 2) Mr. Mills made a racial comment in 1994 about Mr. Noriega; 3) Mr. Mills made the above-described comment about the United Negro College Fund; 4) starting in early 1995, Mr. Mills followed him around and glared at him from time to time; and 5) Mr. Mills eavesdropped on his telephone calls. Plaintiff claims that he additionally told Mr. Moore about his belief that he was not being properly promoted and that he was being discriminated against by Ms. Reis and Mr. Mills.

On March 31, 1995, Mr. Mills told plaintiff that he had changed plaintiff's sign-out time from the previous evening to reflect the earlier time he had observed plaintiff leaving work. Plaintiff objected and disputed Mr. Mills's contention. Plaintiff claims that he also "quietly advised him that I objected to his harassing me and following me around and that I wanted him to stop," before walking away. He states that Mr. Mills came into his department soon after and "lunged at me and I reacted by recoiling back." He claims that Mr. Mills then followed him into the bathroom and brushed his hand against plaintiff's buttocks. He felt so "in fear for my life that Robert Mills would attack and kill me" that he called the police and asked them to arrest Mr. Mills for touching him. The police declined, recommending instead that he make a complaint to the "Human

Rights Commission in Mineola." Mr. Ali told him to take the remainder of the evening off, thereby placing him on administrative leave. Francis Aff. at ¶¶ 15–16.

Plaintiff met with Mr. Moore again on April 11, 1995, and described the occurrences of March 31, 1995. On April 19, 1995, Mr. Moore told plaintiff that his determination was that he had not been the subject of any harassment and asked him to return to work. When plaintiff replied that he was ill, Mr. Moore took him to the Medical Department.

*Allegations Regarding Plaintiff's Disability, Medical Treatment, and Termination*

The first indication of plaintiff's disability came when he suffered a panic attack on May 12, 1994, which prompted him to take medical leave from that day until July 5, 1994. Plaintiff sought treatment from Dr. Roxanne Fahrenwald, an internist, at Stony Brook Hospital, who in turn referred him to Richard Murdocco, a psychotherapist. According to Mr. Murdocco's notes from his first session with plaintiff, plaintiff appeared "anxious, wringing his hands, stating he has been suffering what he defines as panic attacks. Patient states that he has been unable to assume daily activities due to his panic disorder." Murdocco Dep. at 60. Mr. Murdocco saw plaintiff on nine separate occasions over a seven week period, and diagnosed him as suffering the beginning stages of anxiety disorder with elements of agoraphobia. Mr. Murdocco describes agoraphobia as a fear of going outdoors and as a very debilitating phobia.

Plaintiff returned to work in July 1994. He states that he informed the nurses at the nurses department at Chase that he was suffering from panic attacks. He further states that he told Ms. Reis, his supervisor, as early as July 1994 that he suffered from a disorder, but acknowledges that he may not have specified that he had an anxiety disorder until November or December 1994, when he expressly requested from her a reasonable accommodation. Plaintiff states that he told Ms.

Reis that he often grew dizzy from standing up at the printing area and had fallen down and hit the side of his head; therefore, he wished to be seated during the performance of his work.

Ms. Reis states that she never knew at any point in time during plaintiff's employment that he suffered from any health condition that substantially impacted his life and never regarded him as suffering from such a condition. She states that, aside from his medical leaves, plaintiff always reported to work on a regular basis and always performed his assigned job functions satisfactorily. She recalls only one request for any accommodation, which was made on January 9, 1995, the day plaintiff returned from another medical leave. (It is undisputed that plaintiff took another medical leave from January 3 to January 6, 1995.) According to Ms. Reis, plaintiff asked her if he could sit down during part of his shift, and she acquiesced by allowing him to sit down and perform a different function for that shift; she recalled no other occasion when plaintiff asked to sit down or otherwise modify his job functions. Plaintiff asserts that he cannot recall Ms. Reis making any accommodation whatsoever in response to his requests and that he made a request for accommodation to Lorraine Doyle as well, who never responded to him.

Plaintiff took another medical leave beginning on April 24, 1995, which ultimately continued until plaintiff was finally terminated in October 1995. In May 1995, he began receiving treatment from Dr. Tsu Loo. Dr. Loo, who continues to treat plaintiff presently, diagnosed him as suffering from panic disorder with agoraphobia and, after hearing plaintiff describe his work environment and his perception of Mr. Mills, found that "causation is related to employment difficulties at Chemical Bank." Loo Dep. at 67. Dr. Loo has ruled out persecutory delusion because plaintiff has persistently spoken only of Mr. Mills and feeling persecuted by him. Between June and September 1995, plaintiff submit-

ted numerous forms certified by Dr. Loo to Chase stating that he was "medically disabled" and "totally incapacitated to perform his duty as operation specialist." On these forms, Dr. Loo stated that plaintiff was disabled but projected that he could return to work within eight months or so. These forms made no specific requests for any accommodation and did not describe any accommodation that would allow plaintiff to return to work. Plaintiff also applied for Social Security disability benefits, which were granted as of September 1995 and continue to date. Plaintiff receives $720.00 in disability benefits every month.

Plaintiff was terminated by Chase on October 24, 1995 for the stated reason that, in accordance with Chase policy, plaintiff had been on a leave of absence for more than 27 weeks, had used all allotted sick days, and had not elected long term disability coverage. Defendant asserts, and plaintiff does not dispute, that temporary workers of different races, including African–American workers have worked as printer operators, plaintiff's former position. The present printer operator is also African–American. It is undisputed that plaintiff has not worked since April 1995, nor has he looked for work or pursued any job training.

**Procedural Background**

On July 13, 1995, plaintiff filed a charge alleging disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). On August 8, 1995, the EEOC dismissed the disability charge and issued a Right to Sue Letter. On October 30, 1995, plaintiff filed a pro se complaint initiating this action. On the pro se form, he checked the boxes for discrimination and retaliation based on race in violation of Title VII, and alleged intentional infliction of emotional distress. He filed a second charge with the EEOC on November 30, 1995, alleging race discrimination. The EEOC issued a Right to Sue Letter in response on May 28, 1996 on the race discrimination charge.

Plaintiff has since retained counsel. Discovery has been completed

**Discussion**

**Summary Judgment Standards**

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In a discrimination action such as this, it is important to note that

[a] victim of discrimination is ... seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.... Consequently, in a Title VII action, where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate.

*Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991) (citations omitted). On the other hand, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).

**Race Discrimination Under Title VII and HRL**

*Termination*

■ In order to establish a prima facie case of employment discrimination under Title VII, a plaintiff must demonstrate that: (1) he belongs to a protected class; (2) he was performing satisfactorily; (3) his employer made a decision adverse to his interests; and (4) the decision raises an inference of discrimination based on his membership in the protected class. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994). Once a prima facie case has been made, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If this is done, the burden shifts back to the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination. *Id.* at 804, 93 S.Ct. 1817. However, "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted). In the summary judgment context, *St. Mary's* requires a plaintiff to "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging [him] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Services Ltd., Partnership,* 22 F.3d 1219, 1225 (2d Cir.1994). The standards of proof governing an employment discrimination claim raised under the New York HRL are the same as for a Title VII claim. *See Sogg v. American Airlines, Inc.,* 193 A.D.2d 153, 155–56, 603 N.Y.S.2d 21 (1st Dep't 1993).

■ Here, plaintiff has met his initial burden of proof by establishing that he was performing satisfactorily before he was terminated and that his termination raises an inference of discrimination. Both parties agree that plaintiff received performance ratings of "competent" or "commendable" in the years of employment prior to his termination and while he was supervised by Ms. Reis. Plaintiff, however, has failed to raise a material issue of fact as to whether Chase's stated nondiscriminatory reason for termination was merely pretextual. Defendant attaches copies of Chemical/Chase company policies which clearly state that it is the company's policy to terminate any employee who has not returned to work after all allowable periods of paid and unpaid sick leave have been used and that disabled employees may apply for long term disability benefits if they have been out of work continuously for twenty seven weeks or more. In response, plaintiff attempts to raise two material issues of fact that he believes suggest that the stated reason for termination was merely pretextual. Neither of these arguments are convincing.

First, plaintiff offers a document, attached as Exhibit A to his affidavit, which was produced by defendant and which lists the names of employees in the MDP Department. Next to a handful of names, including that of plaintiff, is an asterisk designating those employees who have been "downsized." Plaintiff states that, based upon his own knowledge, all of the employees with asterisks are either African–American or Asian and, thus, their termination constitutes not downsizing but "racial discrimination of the worst sort." Francis Aff. at ¶ 40. This document standing alone is not enough to suggest that plaintiff's termination was motivated by discriminatory animus. Although defendant concedes that this document was produced by Chase during discovery, plaintiff has not authenticated the document as a

business record, nor has he requested from defendant statistical or other evidence regarding the race of all of the other employees who continue to work in the MDP Department. As plaintiff himself has noted, there are numerous African–Americans in the MDP Department; therefore, the mere fact that plaintiff believes that most or all of a handful of employees who were terminated were also minorities is not enough to suggest that Chase's stated reason for plaintiff's own termination was merely pretextual.

Secondly, plaintiff asserts that Ms. Reis, plaintiff's supervisor, has also taken extended medical leave, was out of work for more than twenty-seven weeks, did not elect long-term disability leave, yet was not terminated and remains an employee at Chase. Plaintiff argues that this calls into question Chase's stated policy of automatic termination for any employee who is out on leave for more than twenty-seven weeks without electing long term disability leave. In response, defendant submits a supplemental affidavit from Ms. Reis, in which she states that she requested and received permission to take an unpaid leave of absence of approximately six months in 1987 to care for her first child. Chase informed her that her position would not be held open for her and that she would have to seek another position upon her return. At the end of her leave, Chase advised her that her prior position was no longer available and that if she did not locate a position that was open, she would be terminated. Ms. Reis applied for and obtained a position as reconciling clerk, a position involving reduced responsibilities, less pay, a lower job grade and later hours than her previous position. Unlike Ms. Reis, for whom long term disability coverage was not applicable, plaintiff did not apply for long term disability leave nor did he seek to return to work or take any other measures to avoid termination. Thus; plaintiff cannot establish that Chase treated Ms. Reis preferentially. Nor has plaintiff submitted any other evidence to suggest that Chase's stated policy

as it was applied to him differed from his employer's treatment of a white employee who was similarly situated. As such, plaintiff has not shown that Chase's stated reason for terminating him was in fact pretextual and his claims of racial discrimination under Title VII and the HRL are dismissed.

*Racially Hostile Work Environment*

 In *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court held that, when considering a hostile work environment claim, courts must consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. These factors are to be measured by the totality of the circumstances, *see Williams v. County of Westchester,* 171 F.3d 98, 100 (2d Cir.1999) (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367), and must also be evaluated from both a subjective and an objective viewpoint, *see Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998) (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). As there is no dispute here that Mr. Francis subjectively perceived his work environment to be hostile and abusive, the question here reduces to "whether a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436–37 (2d Cir. 1999). To prevail on a racially hostile work environment claim, a plaintiff must demonstrate "more than a few isolated incidents of racial enmity;" *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986); "instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). "Casual comments, or accidental or sporadic conversation, will not trigger equita-

ble relief...." *Snell*, 782 F.2d at 1103. This standard of proof applies for claims of hostile work environment brought under Title VII as well as the HRL. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n. 4 (2d Cir.1995).

■ The timely filing of a charge with the EEOC is a prerequisite to the maintenance of a Title VII action. *See Butts v. City of New York*, 990 F.2d 1397, 1401 (2d Cir.1993). In New York, where a state agency exists to investigate charges of employment discrimination, a charge of discrimination under Title VII must be filed within 300 days of the occurrence of the conduct of which the charging party complains. *See Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993). In contrast, a state claim pursuant to the HRL is subject to a three year statute of limitations. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998).

■ Defendant argues that plaintiff has identified only four isolated incidents in support of his hostile work environment claim: 1) Ms. Reis's late 1993 or 1994 description of a group of African–American employees (not including plaintiff) as "fucking moolies;" 2) Mr. Mills's 1994 reference regarding Mr. Noriega: "that nigger is a disgrace to all of yous;" 3) Mr. Mills's early 1995 remark regarding the United Negro College Fund; and 4) the written statement plaintiff found on his desk in mid-March 1995 stating, "All niggers should go back to Africa with a Jew under each arm." Defendant contends that the first two incidents are time-barred with regard to his federal claim as plaintiff failed to file an EEOC claim alleging race discrimination until November 30, 1995, more than 300 days after the first two incidents. The isolated occurrence of two allegedly racial comments, defendant ar-

gues, is not enough to create a hostile work environment.

■ Indeed, the first two incidents described by plaintiff are time-barred under Title VII and, even if plaintiff's allegations were considered in their entirety, these allegations are not enough to give rise to a hostile work environment. Construing plaintiff's allegations of Ms. Reis and Mr. Mills's conduct liberally, plaintiff has described only four specific incidents involving racial comments, as opposed to a "steady barrage of opprobrious racial comments," *Schwapp*, 118 F.3d at 110, and a number of more vague descriptions of offensive language and conduct by Mr. Mills that cannot be readily attributed to racial animus.[1] The only other specific incident described by plaintiff occurred on March 31, 1995, when Mr. Mills lunged at him and then, following him into the bathroom, brushed his hand against plaintiff's buttocks. Plaintiff states that he felt so threatened by these actions that he felt compelled to call the police. The law is clear that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." *Quinn*, 159 F.3d at 768 (citing *Tomka*, 66 F.3d at 1305). Here, however, while plaintiff subjectively may have feared for his physical safety, Mr. Mills's conduct in connection with the March 31, 1995 incident fails to rise to the same level of severity as sexual assault, and objectively carried no racial overtones. Considering the totality of the circumstances, plaintiff has suggested at most that Mr. Mills uses offensive language and has evinced a dislike for plaintiff; plaintiff has not, however, sufficiently established a hostile work environment. Plaintiff's claims of hostile work environ-

---

1. For example, plaintiff states in his affidavit that throughout 1993 Mr. Mills engaged in a series of offensive conduct including raising his middle finger in a derogatory manner towards me, directing profane and offensive language to me such as, "fuck you, asshole,"

"you piece of shit," while slamming his hand down on the work station where I was working. As plaintiff himself concedes in his affidavit, "it was difficult to relate Mills' conduct to a racial issue in 1993." Francis Aff. ¶ 4.

ment under both Title VII and the HRL are therefore dismissed.

## Constructive Discharge

■ In his opposition papers, plaintiff suggests that he was arguably constructively discharged because the allegedly hostile work environment caused the onset of his mental disorder which in turn left him incapable of returning to work, which in turn led to his discharge. Any claim of constructive discharge that plaintiff attempts to make cannot survive this motion for summary judgment as he cannot show that the racial animus and harassment he subjectively perceived was objectively pervasive and severe enough to give rise to a hostile work environment. As stated in *Shabat v. Blue Cross Blue Shield*, 925 F.Supp. 977, 982–83 (W.D.N.Y.1996):

> Plaintiff may have believed that he was being subjected to abuse because of his national origin, religion, or disability. His subjective reaction to his coworkers' actions has allegedly been so severe that he has been on disability leave since 1992. Plaintiff's own perception that his work environment was hostile is not enough, however: to prevail on this claim, it is also necessary that plaintiff's work environment be objectively hostile.

Thus, even if plaintiff can show a causal link among his conflict with Mr. Mills, the onset of a debilitating medical condition, and his discharge as a result of extended medical leave, plaintiff must also show, which he fails to do, that his work environment was indeed hostile to a reasonable person and not just merely intolerable to him.

## Failure to Promote and Denial of Salary Increases

■ Defendant asserts that plaintiff cannot establish a prima facie case of failure to promote and that the undisputed facts show that plaintiff received a salary increase every year of his employment with Chase. Plaintiff fails to address directly either of these claims in his opposi-

tion papers, but if one were to read his papers broadly, he appears to claim generally that he had made requests for advancement to Ms. Reis and that she ignored these requests. However, plaintiff does not list specific positions to which he applied and was denied, and Ms. Reis specifically stated at her deposition that there was no open position to consider him for during his tenure. The Court of Appeals for the Second Circuit has held that a plaintiff must "allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998). Plaintiff falls far short of his burden of proof and his claims of failure to promote and denial of salary increases must be dismissed.

## Retaliation Under Title VII

■ Plaintiff raises, for the first time, in his opposition papers a retaliation claim under Title VII. Specifically, plaintiff alleges that Reis failed to consider him for a promotion and that he was excluded from certain meetings. Plaintiff states that he may now raise this claim because it is "reasonably related" to the Title VII claims made in his EEOC charge of discrimination based on race filed on November 30, 1995, and he cites *Butts v. City of New York Dep't of Housing Preservation and Dev.*, 990 F.2d 1397, 1401–02 (2d Cir. 1993) for this position. Defendant contends that the retaliation claim must be dismissed as time-barred and for failure to exhaust administrative remedies as plaintiff failed to raise this claim in either of his EEOC charges.

■ Although failure to exhaust administrative remedies is ground for dismissal of a Title VII claim, *see, e.g., Stewart v. U.S.I.N.S.*, 762 F.2d 193, 197–98 (2d Cir.1985), it is well-established that a district court "has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct

subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts,* 990 F.2d at 1401. In *Butts,* the Court of Appeals for the Second Circuit expressly stated that such reasonably related claims include those alleging retaliation in response to a plaintiff's filing of an EEOC charge of discrimination. *See Shah v. New York State Dep't of Civil Service,* 168 F.3d 610 (2d Cir.1999) (citing *Butts,* 990 F.2d at 1402).

Here, plaintiff fails to qualify for this type of exception to the exhaustion of administrative remedies requirement under Title VII. Plaintiff filed his first EEOC Charge alleging race discrimination and harassment on November 30, 1995. However, plaintiff had already been terminated by Chase on October 24, 1995, and thus, the retaliatory actions alleged by plaintiff could not have occurred in response to his EEOC filing. As plaintiff fails to state a claim "reasonably related" to his EEOC claims, the retaliation claim must be dismissed for non-exhaustion of administrative remedies.

 Even on the merits, plaintiff's retaliation claim must be dismissed for failure to establish a prima facie case of retaliation. A plaintiff must show: (1) participation in a protected activity known to the defendant; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *See Quinn,* 159 F.3d at 769 (citing *Tomka,* 66 F.3d at 1308). Protected activities include the filing of a complaint with the EEOC and opposition by employees against an employer's discriminatory practices. *See Parker v. Sony Pictures Entertainment, Inc.,* 19 F.Supp.2d 141, 152 (S.D.N.Y.1998). An adverse action must affect the "terms, privileges, duration, or conditions of [his] employment." *Dortz v. City of New York,* 904 F.Supp. 127, 156 (S.D.N.Y.1995). A causal connection between the protected activity and the adverse employment action can be "established indirectly with circumstantial evidence" by showing that "the protected activity was followed by discriminatory treatment ... or directly through evidence of retaliatory animus." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). The plaintiff's burden in stating a retaliation claim is slight; he may establish a prima facie case with de minimis evidence. *See Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465 (2d Cir.1997).

Here, plaintiff fails to direct the court's attention to any evidence in the record showing that he was denied promotions or salary increases or that any adverse employment action was causally linked to his complaints of racial discrimination. Plaintiff claims that Ms. Reis acknowledged that she never considered plaintiff for a promotion because of retaliatory animus. However, in the deposition pages cited by plaintiff, Ms. Reis stated that there simply was "no other position to consider him for. He was a grade 6, I believe, and the next step would be a coordinator and there was no open position." Reis Dep. at 80–81. Plaintiff offers no other evidence that he suffered any adverse employment action, or that any such actions can be causally linked to protected activities by a showing of discriminatory treatment or retaliatory animus.

**Disability Under the ADA**

 The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees...." 42 U.S.C. § 12112(a). A plaintiff bringing a claim of discriminatory discharge under the ADA bears the initial burden of establishing a prima facie case of discrimination. To meet this burden, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998).

The ADA describes an individual as suffering from a "disability" if he makes a showing of any one of the following: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "Only a 'qualified individual with a disability' may state a claim for discrimination under the ADA;" even if a plaintiff alleges a firing because of a medical condition, he can bring a claim under the ADA only if his medical condition rises to the level of a "disability." *Parker,* 19 F.Supp.2d at 147.

Plaintiff does not allege that he was unjustly regarded as having a medical impairment when he in fact was not disabled. Therefore, the court's analysis focuses on the legal standard required in order to establish a "disability" as defined under either subsection A or B of Section 12102(2) of the ADA and whether plaintiff proffers sufficient facts to meet this standard. In a recent decision, the Supreme Court articulated a three step process for evaluating a claim of "disability" as defined under the ADA. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998). First, the Court determined whether the plaintiff suffered from a physical or a mental impairment. Second, the Court identified the life activity indicated by the plaintiff and considered whether it qualified as a "major life activity" under the ADA. Finally, the Court determined whether the claimed impairment substantially limited the major life

activity. *See id.* Under this analysis, "a plaintiff who showed that he had an impairment and that the impairment affected a major life activity would nonetheless be ineligible if the limitation of the major life activity was not substantial." *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 641 (2d Cir.1998).

Although the ADA does not define "major life activities" or "substantial limit[ation]," the regulations promulgated by the EEOC under the ADA provide guidance in interpreting the ADA. *See, e.g., Ryan,* 135 F.3d at 870; *Francis v. City of Meriden,* 129 F.3d 281, 283 n. 1 (2d Cir. 1997). "Major life activities" are defined under the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" is defined as:

(i) unable to perform a major life activity that the average person in the general population can perform; or

(ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

Here, plaintiff fails to show that his panic disorder substantially limits a major life activity and therefore cannot sustain a claim under the ADA.[2] Plaintiff makes only a conclusory claim that his ability to "think as a normal person" is impaired. He ex-

---

2. Defendant has also argued that the doctrine of judicial estoppel prevents plaintiff from raising an ADA claim given that he applied for and continues to receive Social Security disability benefits by claiming that he is entirely unable to do any substantial gainful work. The Supreme Court recently held in *Cleveland v. Policy Management Systems,* — U.S. ——, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), that claims for Social Security disability benefits do not inherently conflict with ADA claims because "there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.*

at 1602. Nonetheless, the Court also recognized that "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation." *Id.* at 1603. Therefore, the Court further held that, as the "conflict involves a legal conclusion" regarding "disability," a court considering a summary judgment motion "should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim." Specifically, "[t]o

plains that he would become dizzy at work, and that his panic attacks impede some of his social activities, including his sexual activity. Specifically, plaintiff stated at his deposition that on occasion he cannot "ejaculate with her as hard" as he would like, and that he feels "humiliated" that he is unable to "go out of state somewhere" with a woman because he would not know where the closest hospital was in the event that he suffered a panic attack. As described by plaintiff, the activities of "thinking normally" and "socializing" do not constitute major life activities as contemplated under the ADA. Therefore, plaintiff fails to show that he suffered a disability under the ADA and his claim is dismissed.

### Remaining State Claims

Plaintiff has two remaining state claims, discrimination on the basis of his disability under the HRL and intentional infliction of emotional distress. As all of plaintiff's federal claims have been dismissed, the court declines to exercise supplemental jurisdiction over the remaining state law claims, *see* 28 U.S.C. § 1367(c)(3), and these claims are dismissed without prejudice.

### Conclusion

Defendant's motion for summary judgment is granted and all of plaintiff's federal claims are dismissed, as are his identical claims of race discrimination and hostile work environment under the HRL. The court declines to exercise supplemental jurisdiction over the remaining state law claims of disability discrimination and intentional infliction of emotional distress, and these claims are dismissed without prejudice.

### SO ORDERED.

---

defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.' " *Id.* at 1604. It is unnecessary to require plaintiff to submit an explanation which would meet the standards of *Cleveland* since in any event plaintiff cannot state a claim under the ADA.