Kenton CHANDLER, Plaintiff,

v.

**AMR AMERICAN EAGLE
AIRLINE, Defendant.**

**No. 00 CV 1687 NG.**

United States District Court,
E.D. New York.

March 14, 2003.

Minna Kotkin, Brooklyn, NY, for plaintiff.

Rene Johnson, New York City, for defendant.

### OPINION AND ORDER

GERSHON, District Judge.

Plaintiff, Kenton Chandler, age 54, is a part-time catering clerk for defendant, AMR American Eagle Airline ("Eagle"), a regional affiliate of American Airlines, which provides 1,400 flights per day throughout the United States, Canada, the Bahamas, and the Caribbean. Plaintiff brings this suit alleging failure to accommodate a disability pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and discrimination and hostile work environment pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"). Plaintiff also alleges retaliation for the filing of his federal anti-discrimination claims. Defendant now moves for summary judgment on all of plaintiff's claims.

### Statement of Facts

Unless otherwise indicated, the following facts are undisputed.

Plaintiff has been employed as a catering clerk in Eagle's catering department at John F. Kennedy International Airport ("JFK") in Queens, N.Y. since April 22, 1996. With the exception of the three month period between May 18, 1996 and August 31, 1996, plaintiff has worked as a part-time clerk throughout his employment at Eagle.

Eagle's catering department at JFK is managed by John Ferrara, Catering Manager. Mr. Ferrara makes decisions on hiring and firing within the department. He does not, however, provide on-site supervision of the work on the planes. The Lead Catering Clerk, Roger Heyliger, and Acting Lead Catering Clerk, Lamont Sinkler, provide that supervision. Mr. Heyliger and Mr. Sinkler also assign catering clerks to their daily work areas, complete paperwork relating to inventory, and assist the catering clerks with their general duties. In addition, Mr. Heyliger reviews the performance of potential employees during their probationary period and, on occasion, attends management meetings in Mr. Ferrara's stead.

Catering clerks at JFK are responsible for making ice, loading and stocking incoming planes, and taking inventory on the planes. Clerks service airplanes from two ramps at JFK and make use of three types of trucks while performing their duties. The first vehicle, an unheated two-passenger electric cart, is most commonly used to service the outer ramp. The cart is low to

the ground and workers using it need not climb steps or bend to unload items when stocking planes. The second and third vehicles, a larger heated truck and a heated bus, are most commonly used to service the inner ramp. Both are equipped with stairs and require workers to climb steps and bend over when unloading items to stock the planes.

Eagle employs a bid system, based on seniority, that governs the distribution of shifts among employees. Bids for shifts, including requests to move to or from full-time work, occur every three months if triggered by an employee's request. If no complaints or requests regarding shift assignments are received by the Catering Manager, a bid will not occur. Plaintiff bid for his current shift in August 1996, at which time he elected to become a part-time employee.

Eagle pays overtime wages to all employees who work more than forty hours per week, regardless of their status as full- or part-time employees. Eagle's written policy regarding the distribution of overtime hours provides that hours exceeding scheduled shifts "will be offered in a manner fair to the employees and practical to the operation." According to the deposition testimony of Mr. Ferrara and Mr. Heyliger, it was "company policy" to ask part-time employees to work additional hours in order to avoid payment of overtime to full-time employees.

On March 6, 1999, plaintiff was injured when he slipped on the steps of a catering bus while servicing a plane on the outer ramp of the JFK terminal. Plaintiff finished his shift that day, but called in sick the following day. On March 8, 1999, plaintiff sought medical attention from American Airlines Medical Offices ("AA Medical"), Eagle's employee health service. Dr. Manuel Ceja of AA Medical diagnosed plaintiff with a "buttocks contusion" and placed him on light duty with a 15 pound lifting restriction. Thereafter, plaintiff returned to work.

On March 24, 1999, plaintiff commenced a short-term, seven week disability leave. During this leave, plaintiff saw physicians at AA Medical no fewer then seven times. Based on a March 24, 1999 x-ray by AA Medical, plaintiff was diagnosed with "spinal bifida of the first sacral element." On April 27, 1999, plaintiff was evaluated by Dr. James C. Farmer of the Hospital for Special Surgery in Manhattan who confirmed a diagnosis of "partial spinal bifida" and "loss of disc signal consistent with disc degeneration." Dr. Farmer recommended a course of rehabilitative therapy and a bone scan to rule out occult fracture. On the same day, and at the request of Eagle's insurance carrier, plaintiff was evaluated by Dr. Robert Orlandi, an orthopedist with Concentra Medical Examinations. Dr. Orlandi diagnosed plaintiff with "resolving lumbar sprain without radicular sydrome" and recommended an immediate return to work with a two week restriction on "lifting over 10 pounds" and some limitations on bending. Despite this recommendation, plaintiff's leave continued for another three weeks. On May 13, 1999, plaintiff was examined again by AA Medical and was cleared to return to light duty work with a temporary bending and 15 pound lifting restriction. Plaintiff returned to work on May 16, 1999.

On June 6, 1999, apparently at the request of a female co-worker, Josefina Araya, plaintiff was re-assigned from his work on the outer ramp with Ms. Araya to a job on the inner ramp with Acting Lead Catering Clerk, Mr. Sinkler. Mr. Sinkler and plaintiff had a history of acrimony. Plaintiff alleges that in approximately June of 1998, Mr. Sinkler threatened plaintiff's life, threw a handful of bullets at plaintiff, and had to be physically restrained from striking plaintiff. Following this incident,

plaintiff and Mr. Sinkler interacted and worked together on numerous occasions. Plaintiff reports no subsequent incidents of violence.

On June 7, 1999, plaintiff filed a complaint against Eagle with the EEOC alleging age and disability discrimination. Several hours later, plaintiff met with Sarah Shannon–Gorman, Eagle's Human Resources Representative, and Jackie Losiage, Eagle's Regional Managing Director, to complain of discriminatory treatment in relation to work assignments, his "bad back," and his belief that he was being discriminated against because of his age. During the course of that meeting, plaintiff suffered an acute panic attack and was sent to AA Medical for evaluation.

On June 8, 1999, plaintiff was placed on an extended, unpaid medical leave of absence. Plaintiff's physician, Dr. Herbert Weiner, submitted a letter to Eagle on June 24, 1999 asserting that plaintiff was "totally disabled" and diagnosing plaintiff with "cervical derangement, low back derangement with radiculopathy, internal derangement of right shoulder, contusion sprain of right hand and leg, [and] post-traumatic A/D with panic attacks."

On December 16, 1999, the EEOC issued a Right to Sue letter to plaintiff. On March 20, 2000, plaintiff initiated this suit.

On September 7, 2000, plaintiff appeared before the New York State Worker's Compensation Board. The presiding administrative law judge found that plaintiff continued to suffer from a "moderate, partial causally related disability" and awarded plaintiff benefits of $74.58 per week to cover the time period from August 3, 1999 to December 2000.

On February 6, 2001, plaintiff notified Eagle's counsel that plaintiff was "immediately" ready to return to work. On March 1, 2001, Eagle's counsel replied to that notification by outlining certain "procedur-al steps" that plaintiff was required to take before resuming work. These included an examination by plaintiff's personal physician and clearance from Eagle's medical department based on that examination. On March 6, 2001, plaintiff's attorney acknowledged receipt of the March 1, 2001 letter and requested "all written American Eagle procedures concerning leave and return to work." As of the date of this motion, plaintiff has not yet returned to work.

## Preliminary Procedural Issues

### 1. Plaintiff's Rule 56.1 Statement

As a preliminary matter, defendant seeks to exclude plaintiff's Rule 56.1 Statement ("Statement") on the grounds that plaintiff has not provided a paragraph by paragraph response to the facts set forth in defendant's Statement and that plaintiff's Statement contains allegations not raised in previous court filings. Defendant's application is denied.

District courts have broad discretion to determine the application of local civil rules. *Wight v. Bankamerica Corp.*, 219 F.3d 79, 86 (2d Cir.2000). This includes the discretion to refuse to "elevate the form of papers over the substance of … arguments." *Collings v. Industrial Acoustics Co., Inc.*, 2001 WL 913909, at *1 n. 2 (S.D.N.Y.2001). Since plaintiff's Statement, while not perfect in form, substantially complies with the local rules, this Court declines to find either that plaintiff's Statement should be excluded or that defendant's should be deemed admitted. *Accord Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir.2001) (upholding district court's discretion not to apply Local Rule 56.1 and not to deem defendant's facts admitted where plaintiff failed altogether to file a responsive statement). Accordingly, this court will consider plaintiff's Statement in deciding this motion.

## 2. Failure to Administratively Exhaust Claims

Defendant also seeks to preclude this court from considering several of plaintiff's allegations on the grounds that they were not set forth in, and are not reasonably related to, plaintiff's EEOC charge.

As defendant correctly contends, exhaustion of administrative remedies "is a pre-condition to bringing a Title VII claim in federal court." *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir.2000). A plaintiff typically may raise only those claims that are either contained in an EEOC charge or are "reasonably related" to allegations raised therein. *Holtz*, 258 F.3d at 82–83; *Butts v. City of New York Dept. of Housing Preservation and Development*, 990 F.2d 1397, 1401 (2d Cir.1993). Claims are "reasonably related" to those alleged in an EEOC charge "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, . . . where an employee has alleged retaliation against an employer for the filing of an EEOC charge, [and] where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts*, 990 F.2d at 1402–1403. Pre-charge, as well as post-charge, conduct is subject to the reasonable relation test. *Francis*, 235 F.3d at 766 n. 1; *Woodcock v. Montefiore Medical Center*, 2002 WL 403601, at *4 n. 5 (E.D.N.Y.2002).

Plaintiff's EEOC charge in this case asserts two claims against defendant: a refusal to accommodate "temporary" back and leg injuries and disparate treatment with respect to "pay raises that were given to employees with less seniority." Defendant argues that plaintiff's allegations regarding defendant's failure to accommodate his erectile dysfunction and enlarged prostate, his claims of disparate treatment

based on defendant's failure to provide a bid opportunity to move to full-time employment, his constructive discharge claim, and his claim of retaliation based on discriminatory work assignments are barred for failure to exhaust administrative remedies because they are not reasonably related to the claims raised in plaintiff's EEOC charge. For the following reasons, this court agrees.

■ First, plaintiff's EEOC complaint cannot be reasonably interpreted to encompass plaintiff's claim that defendant failed to accommodate his prostate condition. Plaintiff's EEOC charge alleges only a failure to accommodate back and leg injuries sustained by plaintiff in his March 1999 job-related accident, injuries which post-date by two years the onset of plaintiff's prostate condition. Moreover, the accommodations required for plaintiff's prostate condition, including frequent access to bathroom facilities and extensive lifting restrictions, are not mentioned in plaintiff's physicians' reports and differ significantly in kind and scope from those asserted in relation to plaintiff's back and leg injuries. Since it is not reasonable to assume that a non-job-related injury, incurred two years prior to the disabling condition that is the subject of plaintiff's EEOC complaint, would fall within the scope of an EEOC investigation into that complaint, plaintiff's claim that defendant failed to accommodate his prostate condition is not reasonably related to conduct alleged in his EEOC charge. That claim must therefore be dismissed for failure to exhaust administrative remedies.

■ Similarly, plaintiff's allegation that he was denied an opportunity to move from part-time to full-time work is not reasonably related to his EEOC complaint, which alleges only a denial of "pay raises." While clearly the ability to bid for more hours impacted plaintiff's net pay, plain-

tiff's EEOC complaint does not mention either plaintiff's dissatisfaction with his shift assignment or his status as a part-time worker. Nor does plaintiff's EEOC complaint allege that plaintiff sought and was denied additional hours. In fact, the record reveals that plaintiff frequently complained that he was forced to work more, not less, hours than he desired. Since an inquiry into defendant's system for distributing shift assignments would not reasonably fall within the scope of the EEOC's investigation into plaintiff's disparate pay complaint, plaintiff's claim regarding defendant's failure to provide a bid opportunity for increased hours cannot be deemed reasonably related to the conduct charged in his EEOC complaint. Thus, this claim too must be dismissed for failure to exhaust administrative remedies.

■ Plaintiff's constructive discharge claim is barred for the same reason. Neither at the time that plaintiff's EEOC charges were brought nor during the time that investigations into that complaint were underway, did plaintiff assert that conditions were so intolerable at Eagle that he was forced to resign his position. In fact, both parties are in agreement that, at least as of the date of oral argument in this case, plaintiff remained an Eagle employee on unpaid medical leave. Since plaintiff's EEOC complaint clearly contains no reference to either plaintiff's resignation or termination, and plaintiff remains an employee of Eagle, plaintiff's

constructive discharge claim cannot be said to be "reasonably related" to any conduct charged in his EEOC complaint.[1]

■ Finally, defendant seeks to preclude consideration of plaintiff's retaliation claim relating to allegedly discriminatory work assignments on the ground that plaintiff has failed to exhaust administrative remedies. In *Butts,* the Court of Appeals for the Second Circuit expressly stated that claims alleging retaliation in response to a plaintiff's filing of an EEOC charge of discrimination are reasonably related to claims raised in that charge. *Butts,* 990 F.2d at 1401; *Shah v. New York State Department of Civil Service,* 168 F.3d 610, 614 (2d Cir.1999). Since plaintiff's work re-assignment on June 6, 1999 occurred prior both to plaintiff's threat to file an EEOC complaint on the afternoon of June 6, 1999, see Dep. of K. Chandler at 88, and the actual filing of that claim on June 7, 1999, a claim of retaliation based on that re-assignment is not reasonably related to the later occurring event. That claim must therefore be dismissed for failure to exhaust administrative remedies. Plaintiff has also, however, brought a claim of retaliation based on defendant's refusal to allow plaintiff to return to work without medical authorization in February 2001. That claim is reasonably related to claims raised in plaintiff's EEOC charge and will be considered on the merits below.

---

1. Even if this court were to find that plaintiff's constructive discharge claim was reasonably related to the allegations contained in plaintiff's EEOC charge, that claim would be dismissed on the merits. In his opposition papers, plaintiff suggests that he was constructively discharged because the allegedly hostile work environment at Eagle caused the onset of his mental disorder, which in turn left him incapable, for a period of time, of returning to work. Plaintiff has not, however, established either that he was terminated by Eagle or that a causal link exists between his workplace conflicts and the onset of the alleged debilitating medical condition. As mentioned above, plaintiff and defendant are in apparent agreement that plaintiff is currently an employee of Eagle. Moreover, plaintiff has testified that his adjustment disorder significantly pre-dated his panic attack on June 7, 1999. *See* Dep. of K. Chandler at 181 ("it's there from all the time, that things has been happening and I didn't know what it was").

## A. Standard for Summary Judgment

A motion for summary judgment should be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995). The burden is on the moving party to demonstrate the absence of any material fact genuinely in dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 175, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

In deciding a motion for summary judgment, the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Howley v. Town of Stratford*, 217 F.3d 141, 150–151 (2d Cir.2000). However, the non-moving party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. A motion for summary judgment cannot therefore be defeated by "mere speculation or conjecture." *Giordano v. City of New York*, 274 F.3d 740, 749–50 (2d Cir. 2001).

In employment discrimination actions, courts are particularly cautious about granting summary judgment where intent is at issue. This is because "a victim . . . [is] seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (citations omitted). Consequently, "where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate." *Id.* On the other hand, "the summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Therefore, in the discrimination context, a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997); *Micari v. Trans World Airlines, Inc.*, 43 F. Supp.2d 275, 278 (E.D.N.Y.1999).

## B. Plaintiff's ADA Claims

Plaintiff in this case alleges that defendant failed to accommodate his job-related leg and back injuries when he returned to work in May 1999. To establish a prima facie claim for failure to accommodate under the ADA, a plaintiff must show: (1) that he has a disability within the meaning of the ADA; (2) that his employer is covered by the statute and had notice of his disability; (3) that with reasonable accommodation, he could perform the essential functions of his position; and (4) that the employer refused to make such accommodation. *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 216 (2d Cir.2001); *Thorner–Green v. New York City Dept. of Corrections*, 207 F.Supp.2d 11, 13 (E.D.N.Y.2002).

Defendant does not contest either that it is a covered entity under the ADA or that, at the time plaintiff returned to work in May 1999, he was capable of performing his job duties with reasonable accommodation. Defendant does, however, assert that plaintiff's injuries do not constitute a disability within the meaning of the ADA, that it did not have notice of plaintiff's alleged disability, and that it would not have refused to make reasonable accommodation had appropriate notice been given.

In order to prevail on a claim of failure to accommodate, a plaintiff must, as a threshold issue, show that he suffers from a disability as the ADA defines that term. *See Manz v. Gaffney*, 200 F.Supp.2d 207, 213 (E.D.N.Y.2002). Thus, plaintiff must show that he: (1) had an impairment within the meaning of the ADA; (2) that the impairment in question affected a major life activity; and (3) that the identified major life activity was substantially affected. 42 U.S.C. § 12102(2)(A) (defining a disability as "any physical or mental impairment that substantially limits one or more major life activities"); *Colwell v. Suffolk Cty. Police Dept.*, 158 F.3d 635, 641 (2d Cir.1998), *cert. denied*, 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999); *Francis v. Chemical Banking Corp.*, 62 F.Supp.2d 948, 962 (E.D.N.Y.1999), *aff'd*, 213 F.3d 626 (2d Cir.2000), *cert. denied*, 532 U.S. 949, 121 S.Ct. 1419, 149 L.Ed.2d 359 (2001). A physical impairment is "any physiological disorder or condition ... affecting ... neurological; musculoskeletal; special sense organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine" systems. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 194–195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (quoting 45 C.F.R. § 84.3(j)(2)(i)(2001)). "Major life activities" include "caring for oneself, walking, seeing, hearing, speaking, breathing, learning, and working." *Bragdon v. Abbott*, 524 U.S. 624, 638–639, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (quoting 45 C.F.R. § 84.3(j)(2)(ii) (1997); 28 C.F.R. § 41.31(b) (2) (1997)). *But see Toyota Motor Mfg.*, 534 U.S. at 199–200, 122 S.Ct. 681 (questioning the classification of work as a major life activity); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (same). This list is illustrative, not exhaustive, and the EEOC regulations implementing the ADA have further classified, among others, "sitting, standing, lifting, or reaching" as major life activities. *See Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir.1998).

▆▆▆▆ Plaintiff in this case alleges that he suffered from lower back and leg injuries as a result of his job-related accident at Eagle on March 6, 1999. He further alleges that these injuries limit him in the major life activities of walking, sitting, standing, and working. Thus plaintiff has alleged an impairment affecting major life activities as required by the ADA. In support of his claim that these injuries substantially limit the described major life activities, plaintiff's physician has testified that plaintiff is currently unable to walk, stand, or sit for more than 30 minutes at a time. Dep. of H. Weiner at 14, 17. Medical reports immediately pre-dating plaintiff's return to work in May 1999, however, make no mention of any of these limitations. In fact the medical reports issued at the time that plaintiff alleges defendant denied him reasonable accommodation indicate only that plaintiff was limited in his ability to engage in heavy lifting, bending, stooping, squatting, pushing and pulling. Since plaintiff has produced no evidence that he was impaired in his ability to sit, stand, or walk at the time of his May 1999 return to work, these reports cannot form the basis of his disability claim. These reports are also insufficient to establish that plaintiff was substantially limited in his ability to engage in the major life activities of lifting, bending, stooping, squatting, pushing, and pulling. First, the reports provide no information regarding the extent of plaintiff's impairments. Second, at least two of the reports indicate that plaintiff's limitations were temporary in nature and could be accommodated by restriction to light duty. Since minor and temporary impairments of one's ability to engage in major life activities are not actionable under the ADA, *see Colwell*, 158

F.3d at 643–44 (inability to engage in heavy lifting does not constitute a qualifying disability under the ADA); *Glozman v. Retail, Wholesale & Chain Store Food Employees Union, Local 338,* 204 F.Supp.2d 615, 623 (S.D.N.Y.2002) (inability to lift in excess of ten pounds or sit for extended period of time does not constitute a substantial limit on a major life activity); *Gittens v. Garlocks Sealing Techs.,* 19 F.Supp.2d 104, 111 (W.D.N.Y. 1998) (temporary lifting restriction insufficient to establish a disability under the ADA), plaintiff's failure to produce any evidence regarding the extent of his lifting, bending, stooping, squatting, pushing and pulling restrictions is fatal to his claim.

Plaintiff also asserts that he was substantially limited in his ability to engage in the major life activity of work during the time period in question. He has not, however, produced any evidence in support of this claim. When work itself is identified as the qualifying major life activity, the term "substantially limits" has been specifically interpreted to mean "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." *Giordano,* 274 F.3d at 747. In other words, "the inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working." *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139; *Giordano,* 274 F.3d at 748 (quoting 29 C.F.R. § 1630.2(j)(3)(i)); *Serrano v. Terence Cardinal Cooke Health Ctr.,* 2002 WL 31027183, at *4 (E.D.N.Y.2002). Since plaintiff has produced no evidence, other than conclusory statements, that he was substantially limited in his ability to engage in a broad category of jobs, work cannot form the basis of plaintiff's disability claim.

█ Plaintiff also asserts that defendant discriminated against him by failing to accommodate his request to return to work in February 2001. While plaintiff has produced sufficient evidence to allow a reasonable jury to conclude that, at the time of his February 2001 request to return to work, he was disabled within the meaning of the ADA, *see* Dep. of H. Weiner at 14–17 (testifying that plaintiff cannot sit for more than 30 minutes or stand or walk without pain), he has failed to produce any evidence that defendant was on notice of that disability or failed to accommodate it. Plaintiff's communications with Eagle regarding his return to work do not in any way suggest that plaintiff required or was requesting accommodation of any kind. Plaintiff's letter of February 6, 2001 indicates only that plaintiff was "ready to return to work at Eagle, immediately." Defendant's Exh. 28. Nor has plaintiff presented any other evidence that he requested job reassignment or specifically sought to participate in defendant's existing job reassignment program. Defendant's demand that plaintiff submit to a medical examination by his personal physician prior to returning to work cannot be construed as a refusal to accommodate plaintiff's disability in the absence of a specific request for such accommodation by plaintiff. *Thorner–Green,* 207 F.Supp.2d at 14–15. Nor has plaintiff alleged that Eagle's actions in this regard were inconsistent with its stated policy covering employees returning to work following extended medical leave. Plaintiff's failure to make any attempt to comply with defendant's procedures or to pursue a return to work in any other capacity only serves to undermine his failure to accommodate claim. No reasonable jury could find, on these facts, that defendant violated plaintiff's rights.

## C. Plaintiff's ADEA Claims

Under the ADEA, it is unlawful for an employer to take adverse employment ac-

tion against any individual because of that individual's age. 29 U.S.C. § 623(a)(1) (defining ADEA-protected class as individuals who are at least 40 years of age). In this case, plaintiff alleges that Eagle engaged in age-based discrimination both in terms of work assignments and compensation.

The *McDonnell Douglas* framework for establishing a prima facie case of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.; McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also applies to ADEA claims. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (applying *McDonnell Douglas* to ADEA claim); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (same). Under *McDonnell Douglas*, the plaintiff bears the minimal burden of proving by a preponderance of the evidence that: (1) he was a member of a protected class; (ii) he was qualified for the job in question; (iii) he suffered an adverse employment action; (iv) under circumstances giving rise to an inference of discrimination. Once a prima facie case has been established, a presumption arises that the employer unlawfully discriminated and the burden shifts to the employer to present a non-discriminatory reason for the adverse employment action. "Once ... the employer's nondiscriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Assoc.*, 233 F.3d 149, 156 (2d Cir.2000).

In this case, it is uncontroverted that plaintiff was a member of a protected class. Plaintiff was, during the time period giving rise to this litigation, over 40 years old. Defendant has not questioned plaintiff's qualifications for the position of catering clerk. Thus, the only issues before this court in relation to plaintiff's prima facie case are whether Eagle has taken adverse employment action against plaintiff and, if so, whether that action occurred in circumstances giving rise to an inference of discrimination.

 Only "materially adverse changes" in the terms and conditions of employment are actionable under the ADEA. *Henriquez v. Times Herald Record*, 1997 WL 732444, at *5 (S.D.N.Y.1997), *aff'd*, 165 F.3d 14 (2d Cir.1998). A job re-assignment, without attendant materially adverse consequences, is not an adverse employment action. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000); *Georgy v. O'Neill*, 2002 WL 449723, at *11 (E.D.N.Y.2002). In order to establish a claim of age-based discrimination in relation to his work assignments, plaintiff must therefore show that, as a result of re-assignment, he suffered materially adverse changes in the terms and conditions of his employment.

 Plaintiff in this case alleges that Eagle engaged in age-based discrimination when, on June 6, 1999, it re-assigned him from his regular duty servicing planes on the outer ramp with co-worker, Josefina Araya, to work on the inner ramp with Acting Lead Catering Clerk, Lamont Sinkler. Plaintiff cannot, however, establish that this re-assignment was a materially adverse employment action. Plaintiff has testified that his general job duties included work on both ramps of the terminal, that catering department employees perform essentially the same tasks on both ramps, and that catering clerks are assigned to their positions and vehicles as needed. Dep. of K. Chandler at 95. Plaintiff has further testified that he had no personal preference for assignment to

any particular ramp. *Id.* at 327. Most significantly, plaintiff has not alleged that the June 6 re-assignment affected his pay, hours, or position within the organization.[2]

Plaintiff's allegations regarding discriminatory work assignments pre-dating the June 6, 1999 re-assignment suffer from the same deficiencies. Moreover, they are conclusory in nature and non-specific as to date, time, or frequency of occurrence. Since plaintiff has not alleged that he was ever assigned tasks that exceeded his general job duties or that any assignment affected his pay, hours, or position within the organization, none of these allegations is sufficient to establish an adverse employment action for the purposes of plaintiff's age discrimination claim.

Plaintiff's claim of discriminatory compensation must also be dismissed. Plaintiff has failed to provide any evidence that he was paid less than similarly situated employees at Eagle. *See Belfi v. Prendergast*, 191 F.3d 129, 140 (2d Cir.1999) (setting forth the elements of a prima facie case of discriminatory compensation). Defendant's payroll report indicates that plaintiff was the highest-paid part-time employee at Eagle based on his hourly wage. *See* Defendant's Exh. 4. Other than a vague allegation that another un-named employee once mentioned that she received a higher hourly wage, *see* Dep. of K. Chandler at 191, plaintiff has provided no evidence in support of his disparate pay claim. Thus, plaintiff has failed to establish a prima facie case of discriminatory

compensation. Accordingly, that claim must be dismissed.

**D. Plaintiff's Hostile Work Environment Claim**

Plaintiff alleges that he was subjected to a hostile work environment on the basis of age and age-related disability over the course of his four years of employment at Eagle. In support of this claim, he offers partially corroborated testimony that his supervisor and co-workers frequently made age-related comments and told plaintiff that he was "too slow." *See* Affidavit of Y. Matthews. In addition, plaintiff claims that, on at least two occasions, Mr. Heyliger and Mr. Sinkler referred in short-hand to plaintiff's erectile dysfunction and made comments regarding his urination capabilities. Plaintiff additionally testified that on numerous occasions Mr. Heyliger and Mr. Sinkler gave plaintiff discriminatory work assignments and made threats in an attempt to prevent him from complaining about these assignments to their mutual supervisor, Mr. Ferrara. Most seriously, plaintiff alleges that in April of 1996, Mr. Heyliger forced plaintiff to loan him $100 under threat of dismissal and that in June of 1998, Mr. Sinkler threatened plaintiff's life, threw bullets at his feet, and had to be physically restrained from attacking plaintiff. As will be seen, these facts, when considered in light of the totality of the circumstances, are insufficient to allow a reasonable jury to find that plaintiff was subjected to a hostile work environment.

2. Even if plaintiff were able to establish a prima facie case of employment discrimination based on his June 6, 1999 reassignment, he cannot withstand defendant's motion for summary judgment on this claim. Defendant has offered a compelling non-discriminatory rationale for the June 6 re-assignment, namely the protection of plaintiff's co-worker, Josefina Araya, from sexual harassment by plaintiff. *See* Dep. of S. Shannon–Gorman at 122;

Dep. of R. Heyliger at 110. Plaintiff has neither attempted to prove that defendant's proffered rationale was pretextual nor offered sufficient evidence "taken as a whole... to support a reasonable inference that prohibited discrimination occurred." *James*, 233 F.3d at 156. Summary judgment is therefore proper on this aspect of plaintiff's age discrimination claim.

When considering a hostile work environment claim, courts must consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Francis*, 62 F.Supp.2d at 958. These factors are to be measured by the totality of the circumstances, *see Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir.1999), and must be evaluated from both a subjective and objective viewpoint. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir.1998). To prevail on a hostile work environment claim, a plaintiff must demonstrate "more than a few isolated incidents." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986). "Casual comments, or accidental or sporadic conversation will not trigger equitable relief." *Id.* Of course, there is "no fixed number of incidents that a plaintiff need endure to establish a hostile work environment claim." *Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir.2002). Indeed, the Court of Appeals for the Second Circuit has held that one incident may be sufficient to establish a claim, if that incident significantly alters the conditions of the victim's employment. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) (one incident of sexual assault sufficient to give rise to a claim of hostile work environment). The true question to be considered is thus whether plaintiff's allegations, in context, show a workplace "permeated with discriminatory intimidation, ridicule and insult." *Harris*, 510 U.S. at 21, 114 S.Ct. 367.

■ Plaintiff in this case has not provided sufficient evidence to support his hostile work environment claim. First, plaintiff has not alleged harassing comments sufficiently pervasive, either from a subjective or objective perspective, to es-tablish a hostile work environment. Plaintiff testified that many of his supervisor's and co-workers' age-related comments were made in jest and were not discriminatory in nature. *See* Dep. of K. Chandler at 73–75, 169. While plaintiff testified that Mr. Heyliger and Mr. Sinkler were "constantly call[ing] me a f* * *ing old man," he identifies only three specific occasions on which such derogatory language was used. See Dep. of K. Chandler at 120, 190–191. Plaintiff further testified that he continued to work with both men following the alleged name-calling and that, while others were not subjected to age-related comments, both men had significant personality conflicts with other catering clerks. Dep. of K. Chandler at 99–100, 118, 119.

Second, although plaintiff has alleged that he was frequently given less desirable work assignments on account of his age, he has not provided sufficient evidence to support a hostile work environment claim based on those assignments. Plaintiff has not alleged that he was ever asked to perform tasks that exceeded his normal job duties. See Dep. of K. Chandler at 95, 102, 327. Nor has plaintiff alleged that he was asked to perform humiliating or demeaning tasks. Plaintiff's allegations that he was asked to work while others took breaks, *id.* at 167, are too vague in nature and non-specific as to time and frequency of occurrence to serve as a basis for his hostile work environment claim. Plaintiff's claim that he was improperly reprimanded for leaving early on a date when he himself admitted that he was preparing to depart several minutes prior to the end of his shift, *id.* at 115–116, is similarly insufficient to establish a hostile work environment. Finally, while Mr. Sinkler's alleged threat to force plaintiff to mop the floor on June 6, 1999 might be correctly categorized as a demeaning work assignment had that threat been carried out,

plaintiff testified that he was never asked to actually perform any such task. *Id.* at 98.

 Plaintiff's allegations regarding his loan of $100 to Mr. Heyliger under threat of dismissal and the bullet incident involving Mr. Sinkler are more troubling. Certainly both incidents, if established, are deserving of moral censure. As will be seen, however, neither incident is sufficient, in the context of plaintiff's four years of employment at Eagle, to establish a hostile work environment. *Accord Alfano,* 294 F.3d at 380. First, the two alleged incidents occurred over a year apart and more than a year prior to plaintiff's filing of his EEOC complaint. Second, plaintiff has failed to allege that either incident, subjectively or objectively, was "so severe or pervasive as to alter the terms and conditions of employment for the worse." *Francis,* 62 F.Supp.2d at 958. Plaintiff reports no continuing fear of either Mr. Heyliger or Mr. Sinkler nor an inability to perform his job duties as a result of their harassing conduct. In fact, plaintiff specifically testified that he worked with both men on several subsequent occasions without incident, and without apparent fear. Plaintiff testified that he had no "problems" with Mr. Sinkler following the June 1998 bullet incident. Dep. of K. Chandler at 278. In fact, the only other negative encounter between plaintiff and Mr. Sinkler noted by plaintiff is a verbal altercation in which plaintiff admitted to making vaguely threatening remarks to Mr. Sinkler. *Id.* at 100. Plaintiff also testified that his relationship with Mr. Heyliger was mutually acrimonious and that, on at least one occasion following the completion of his probationary period, plaintiff yelled at Mr. Heyliger in front of the rest of the catering crew. Dep. of K. Chandler at 99–100. Although plaintiff testified that he did not report the bullet incident to his supervisor, Mr. Ferrara, because of fear of retaliation, Dep. of K. Chandler at 127, 160, 333, plain-

tiff also testified that he generally felt free to voice his dissatisfaction with his working conditions and complained "every time" either Mr. Heyliger or Mr. Sinkler took negative action against him. *Id.* at 111–112, 117, 173. Since plaintiff has not provided any evidence to suggest that either incident, on its own, either objectively or subjectively, created an intolerable working environment, this court finds that neither is sufficient, when considered in light of the totality of the circumstances, to establish a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Nor can plaintiff prevail on the theory that these two incidents, when viewed in conjunction with his previously discussed allegations of recurring verbal harassment and discriminatory work assignments, are sufficient to establish a hostile working environment. Taking all of the incidents in combination, and viewing them in the totality of the circumstances of plaintiff's four years of employment at Eagle, plaintiff cannot establish to a rational fact-finder the existence of a hostile working environment.

**E. Plaintiff's Retaliation Claim**

 Plaintiff alleges that Eagle retaliated against him by requiring him to submit to a medical examination before allowing him to return to work in February of 2001. In order to prevail on this claim, plaintiff must establish that he: (1) was engaged in a protected activity; (2) that defendant was aware of that activity; (3) that he was subjected to an adverse employment action; and (4) that a causal connection exists between the protected activity and the adverse employment action. *Quinn v. Green Tree Credit Corp,* 159 F.3d 759, 765 (2d Cir.1998). While plaintiff has established the first two elements of his retaliation claim, he has not alleged any causal connection between his

engagement in protected activity and defendant's request that he submit to a medical examination. The timing of the two incidents alone cannot provide a causal connection in this case because defendant's request that plaintiff submit to a medical examination occurred almost a year after the initiation of this lawsuit. *See Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). Nor has plaintiff presented any evidence to suggest that Eagle's request was a deviation from its established policy for employees returning from extended medical leave. Plaintiff's failure to show any causal connection between plaintiff's complaint and defendant's request is therefore fatal to his claim.

### Conclusion

Defendant's motion for summary judgment is granted as to all of plaintiff's claims. The Clerk of Court is directed to enter judgment for defendant and to close this case.

**SO ORDERED.**