**Edwin ROMAN–MARTINEZ, Plaintiff,**

v.

**John E. POTTER, Postmaster General, Defendant.**

**Civil No. 04–1475 (FAB).**

United States District Court, D. Puerto Rico.

April 2, 2008.

Judith Berkan, Berkan & Mendez, San Juan, PR, for Plaintiff.

Ginette L. Milanes, Maritza Gonzalez, Michael Best & Friedrich LLP, Milwaukee, MI, PR, for Defendant.

## OPINION AND ORDER

BESOSA, District Judge.

Pending before the Court is defendant John E. Potter's motion for summary judgment (Docket No. 71), which plaintiff Edwin Roman–Martinez opposed (Docket No. 81). Defendant filed a reply to plaintiff's opposition (Docket No. 92), which plaintiff moved to strike (Docket No. 94). Defendant then opposed plaintiff's motion to strike (Docket No. 95). For the reasons stated below, the Court **grants** defendant John E. Potter's motion for summary judgment and **grants in part** and **denies in part** plaintiff Edwin Roman–Martinez's motion to strike and to deem admitted his additional facts submitted in support of his opposition to summary judgment brief.

### I. *Mr. Roman's motion to strike and to deem facts admitted*

As an introductory matter, this Court shall first address Mr. Roman's motion to strike Mr. Potter's reply brief and to deem as admitted Mr. Roman's "additional facts" submitted in support of his opposition brief because it affects how the Court reviews the record on summary judgment. The basis for Mr. Roman's motion is Mr. Potter's failure to comply with local rule 56(d), which requires a party replying to an opposition to summary judgment motion to submit a separate statement of material facts admitting, denying or qualifying the additional facts submitted by the opposing party. Loc. Civ.R. 56(d). Mr. Potter responded that the inclusion of "pages and pages of inconsequential minutiae" does not oblige him to spend time and resources responding to it. The Court disagrees. There is no exception in local rule 56(d) for inconsequential facts asserted as material by the opposing party. Therefore, Mr. Roman's "additional facts" are deemed established, where supported by proper record citation and

not contrary to the properly supported material facts asserted by Mr. Potter in his statement of material facts. *Cf., De La Vega v. San Juan Star, Inc.,* 377 F.3d 111, 116 (1st Cir.2004) ("The opposing party, by failing to file a response as required by the rule, waives the right to controvert the facts asserted by the moving party in the motion for summary judgment and the supporting materials accompanying it. The court will accept as true all material facts set forth by the moving party with appropriate record support.") (*citing Jaroma v. Massey,* 873 F.2d 17, 20 (1st Cir. 1989) (*per curiam* )). As is apparent from the record citations, in this opinion and order the Court relies almost exclusively upon Mr. Roman's statement of facts submitted in accordance with Local Civil Rule 56(c) and plaintiff's exhibits, with the key exception of the facts contained in paragraph nine of Mr. Potter's statement of facts (Docket No. 75), and the exhibits supporting that paragraph.

The Court considers that deeming plaintiff's facts admitted, where supported by the record, is a sufficient ameliorative measure and shall not exercise its discretion in the enforcement of the local rules to strike Mr. Potter's reply brief from the record.

## II. *Factual Background*

### A. *Circumstances surrounding Mr. Roman's request for a transfer*

Plaintiff Roman has been an employee of the Postal Service in Puerto Rico since August of 1987. In June or July of 2002 Mr. Roman's wife and children moved from Puerto Rico to Florida. On or about October 17, 2002, Mr. Roman submitted an on-line application for a transfer from Puerto Rico to the Central Florida Dis-

trict, Mid Florida Plant and Distribution Center, for a position as a custodian or a mail processing clerk. The online form was filled out at Mr. Roman's request by his then supervisor, Jose Rivera.

On December 13, 2002, Mr. Roman was seen by a social worker in the Employee Assistance Program who referred him to Hospital Panamericano for an evaluation because Mr. Roman "presents severe depression" and "fears total lack of control of his impulses, aggressiveness." (Docket Nos. 81–2, ¶ 2.17; 89–3, Pl. Ex. Q.) Subsequently, Mr. Roman visited his private psychiatrist, Dr. Juanita Leon, who, on January 13, 2003, referred him to Panamerican Institute, a psychiatric facility, for an evaluation because he suffered from irritability and sleep disturbances. (Docket Nos. 81–2, ¶ 2.17 (the second 2.17); 89–4, Pl. Ex. R.) On January 27, 2003, Mr. Roman was admitted to First Hospital Panamericano where he was diagnosed as having bipolar disease. He was not released from the Hospital until February 3, 2003, at which time it was recommended that he continue ambulatory treatment and that he manage stress at work. (Docket No. 81–2, ¶ 2.18; 81–7 & 89–5, Pl. Ex. S.) Shortly thereafter (it is unclear when), Mr. Roman was hospitalized again at First Hospital Panamericano where he was diagnosed with depression. (Docket No. 81–2 ¶ 2.19; 81–8 & 89–6, Pl. Ex. T.) He was released on February 12, 2003 with a recommendation that he meet with Dr. Leon on February 25, 2003.[1]

Following Mr. Roman's second release from First Hospital Panamericano, he was provided with a note directed "To Whom It May Concern," dated February 13, 2003. In this note a Doctor Franco recommended that Mr. Roman be transferred to

---

1. Mr. Roman was hospitalized three times from the time that his wife left Puerto Rico for Florida in mid–2002 and until either when she returned or until his deposition on No-

vember 16, 2007, but the record is silent as to the third hospitalization. (Docket Nos. 81–2, ¶ 4.2; 81–4, Pl. Ex. B, p. 169–70.)

Florida so that Mr. Roman could be with his family because Mr. Roman "suffers from a psychotic condition that has been exacerbated" by his family's move to Florida. (Docket Nos. 81–2, ¶ 4.3; 81–9, Pl. Ex. DD.) Then on February 20, 2003, Mr. Roman's private psychiatrist Dr. Juanita Leon provided him with a second note. In her note, Dr. Leon stated that Mr. Roman has a "psychiatric condition" and that the move of his family to Florida is a "stressor to his condition." (Docket Nos. 81–2, ¶ 4.4; 81–9, Pl. Ex. EE.) Both the February 13, 2003 note and the February 20, 2003 note from Mr. Roman's doctors were received at the Post Office on February 24, 2003. (Docket Nos. 81–2, ¶ 4.5; 81–9, Pl. Exs. DD & EE.) That same day Mr. Roman's Post Office Health Unit Case Record was updated to reflect that he was admitted to the Hospital from January 13, 2003 to February 13, 2003 due to "Bipolar Disorder." (Docket Nos. 81–2, ¶ 4.6; 81–7, Pl. Ex. P.) The case record reflects that Mr. Roman's private psychiatrist found him fit for duty with the accommodation that he not interact with the public directly. (Docket Nos. 81–2, ¶ 4.6; 81–7, Pl. Ex. P.)

Not long thereafter, Mr. Roman sent a letter to the "Mid Florida Personnel Service Center ... Attention Bob King," dated March 5, 2003. (Docket No. 81–9, Pl. Ex. FF.) In his letter, Mr. Roman stated that he was "requesting transfer to the Mid Florida area on medical condition." (*Id.*) Mr. Roman also stated that his condition was aggravated by his separation from this family, which was then residing in Florida. (*Id.*) Mr. Roman attached the notes from his doctors in which they recommended that he be transferred to Florida.

## B. *The denial of Mr. Roman's transfer request*

On March 12, 2003, Suzan Scully, a Human Resources Specialist at the Mid Florida processing location, downloaded Mr. Roman's October 2002 transfer request. (Docket Nos. 81–2, ¶ 5.10; 81–9, Pl. Ex. GG.) The following day, March 13, 2003, Mr. Roman's application for a reassignment to the Mid Florida location was rejected by Michael Katez, Plant Manager at the Mid–Florida Processing and Distribution Center. (Docket Nos. 81–2, ¶ 5.11; 81–9, Pl. Ex. JJ.) The reasons provided for the rejection were "unsatisfactory attendance" and "unsatisfactory safety record." [2] (*Id.*)

Prior to denying Mr. Roman's application, Mr. Katez reviewed a folder of documents prepared by Ms. Scully. The folder included the October 2002 transfer request along with the following documents: absence analysis forms for 2001–2003, a safety and health accident history form, an "employee injury display," a form showing use of annual leave, sick leave, and other forms of leave, a reassignment log supervisor evaluation, an FMLA hours usage form, and an approval/disapproval form. (Docket Nos. 81–2, ¶¶ 5.12 & 5.14; 81–9, Pl. Ex. KK.) Notably, the documents reviewed by Mr. Katez did not include Mr. Roman's March 5, 2003 letter in which he requested the transfer as an accommodation for his medical condition.[3] There was,

---

2. This second reason, "unsatisfactory safety record" is not supported by the documents contained in the folder reviewed by Mr. Katez; the safety and health accident history form indicated there was no history on file for Mr. Roman. (Docket Nos. 81–2, ¶¶ 5.23 & 5.37; 81–9, Pl. Ex. KK.)

3. Mr. Roman questions Mr. Katez's claim not to have seen the March 5, 2003 letter prior to making his decision on Mr. Roman's transfer request, noting that the letter was sent eight days prior to Mr. Katez's decision and that it was directed to the same PO Box and individualized zip code used by the Personnel Office. (Docket Nos. 81–2, ¶¶ 5.40 & 5.41; 81–9, Pl. Exs. FF & UU.)

however, a reference to Mr. Roman's transfer request as an accommodation for Mr. Roman's medical condition contained in the reassignment log supervisor evaluation which was part of the folder that Mr. Katez reviewed prior to rejecting Mr. Roman's transfer request. (Docket Nos. 81–2, ¶ 5.38; 81–9, Pl. Ex. KK.) The absence analysis form included in the folder also contained a reference to Mr. Roman's hospitalization in January of 2003. (Docket No. 81–9, Pl. Ex. KK.)

Mr. Katez stated under oath that at the time of his decision on Mr. Roman's transfer request, he was unaware of Mr. Roman's alleged disability. (Docket No. 81–2, ¶ 6.11; 81–10, Pl. Ex. VV.) Moreover, Mr. Roman had not mentioned a medical disability nor did he request a reasonable accommodation. (*Id.*) Mr. Katez stated that he denied Mr. Roman's request because of Mr. Roman's "poor attendance." (*Id.*)

## C. *Roman's history of mental illness*

In 1988, after Mr. Roman began working at the Post Office, he was first diagnosed with a psychiatric condition: schizophrenia. (Docket Nos. 81–2, ¶ 2.1; 81–3, Pl. Ex. A, p. 27–28.) The following year, on May 16, 1989, Dr. Ricardo Fabre evaluated Mr. Roman for fitness for duty. (Docket No. 81–2, ¶ 2.2; 81–7, Pl. Ex. M.) Dr. Fabre diagnosed Mr. Roman with schizophrenia, recommended treatment, and also recommended that Mr. Roman work on a part-time basis performing only light duties. (Docket No. 81–2, ¶¶ 2.2 & 2.3; 81–7, Pl. Ex. M.) The following year, on June 17, 1990, Dr. Ubaldo Bocanegra drafted a report about Mr. Roman in which he recommended that Mr. Roman be considered totally disabled. (Docket No. 81–2, ¶¶ 2.4; 81–7, Pl. Ex. N.) In his report, Dr. Bocanegra noted that Mr. Roman had already been hospitalized but that he checked himself out and returned to work. (*Id.*) Two months later, on August

8, 1990, Dr. Fabre prepared a second fitness for duty report for the Post Office in which he found Mr. Roman unfit to perform his duties safely or adequately and noting that Mr. Roman's response to treatment was "very poor." (Docket No. 81–2, ¶ 2.6; 81–7, Pl. Ex. O.)

While the record is not completely clear, it appears that Mr. Roman was absent from work from 1990 until 1998. (Docket No. 81–2, ¶¶ 2.6, 2.7 & 3.10.) In early 1998, at Mr. Roman's request, his psychiatrist, Dr. Bocanegra, met with the Postal Service's medical officer, Dr. Luis Echevarria, and Postal Inspector Frank Silva to discuss the conditions under which Mr. Roman could return to work. (Docket No. 81–2, ¶ 3.10.) Following the meeting, on January 23, 1998, Dr. Echevarria prepared a medical assessment of Mr. Roman finding that he was medically qualified to perform the essential functions of the position without accommodation and recommending that Mr. Roman consider continuing treatment with Dr. Bocanegra. (Docket Nos. 81–2, ¶ 3.11; 81–8, Pl. Ex. W.) Dr. Bocanegra's own note of the meeting specified that Mr. Roman could return to work if he continued meeting with Dr. Bocanegra once a month and if he continued taking three medications. (Docket Nos. 81–2, ¶ 3.11; 81–8, Pl. Ex. X.)

Since returning to work in the Post Office in 1998, Mr. Roman has worked 40 hours a week, 8 hours a day. (Docket Nos. 81–2, ¶ 3.14; 81–4, Pl. Ex. C, p. 56.) During that period Mr. Roman made several requests for reasonable accommodation from his supervisors based upon his schizophrenia. (Docket Nos. 81–2, ¶ 3.12; 81–3, Pl. Ex. A, p. 32.) Specifically, on four separate occasions: October 3, 2000, November 14, 2000, December 12, 2000, and July 19, 2001, Mr. Roman's psychiatrist Dr. Leon provided Mr. Roman with medical certificates in which she recom-

mended reasonable accommodation for Mr. Roman allowing him to alternate his time between tasks requiring interaction with the public and tasks that did not involve interaction with the public. (Docket Nos. 81–2, ¶¶ 3.15–3.21; 89–7, Pl. Ex. Z; 89–8, Pl. Ex. AA; 89–9, Pl. Ex. BB; 89–10, Pl. Ex. CC.) Mr. Roman's repeated requests for accommodation were not granted. (Docket No. 81–2, ¶ 3.22; 81–3, Pl. Ex. A, p. 33.)

### D. Mr. Roman's testimony regarding the life-altering effects of his medical condition and the effects of treatment

Mr. Roman's medical condition affects his relations with his wife, children, parents, neighbors and others. (Docket No. 81–2, ¶¶ 2.10 & 2.12.) It affects his intimate relations with his wife and his ability to concentrate or study. (Docket No. 81–2, ¶¶ 2.11 & 2.12.) When Mr. Roman is exposed to too many people he feels asphyxiated and claustrophobic. (Docket Nos. 81–2, ¶ 2.14.) He also cannot "deal with" two sources of noise simultaneously. (Docket Nos. 81–2, ¶ 2.14; 81–3, Pl. Ex. A, p. 45.) All of these limitations pale, however, in comparison to what Mr. Roman experiences when he is in a moment of "crisis."

When Mr. Roman is in crisis he does not know what he is doing; he does not know if he has any cognitive functions and he hears voices. (Docket Nos. 81–2, ¶ 2.13; 81–3, Pl. Ex. A, p. 40.) With treatment and medication, however, Mr. Roman is able to stabilize his condition, which allows him to work with the public.[4] (Docket No. 75–7, Def. Ex. 6.) He can essentially function normally.[5] (Docket Nos. 81–3, Pl. Ex. A, p. 41; 75–7, Def. Ex. 6).

### III. Summary Judgment Standard

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

4. In Mr. Roman's May 31, 2006 deposition he provided the following testimony:

"Q: And, when you have the position of contact with the public again, was it because you asked to be placed again with, with the public or how does that come about? A: Yes, because then I'm with the medical treatment and, and I achieved the control that, that I had before. A: And they allowed you . . . A: I managed to stabilize the condition. Q: And then you achieved returning to the window again? A: That is so. Q: Was there no impediment for you to occupy that position again? A: No." (Docket No. 75–7, Def. Ex. 6, p. 53.)

5. In Mr. Roman's May 31, 2006 deposition he provided the following testimony:

"Q: . . . How often do those moments of crisis occur? A: I believe that the last one was in '97, in '97. Q: And how have you managed to control the crisis episodes? A: Because I have a physician, I have a psychi-

atrist, I have medication, I have treatment. Q: And that allows you to function normally? A: Up to now, thank God and the Virgin it has." (Docket No. 81–3, Pl. Ex. A, p. 41.)

In Mr. Roman's May 4, 2007 deposition he provided the following testimony:

"Q: What were your symptoms when you were diagnosed with bipolar disorder? A: Well, at this point I have already been treated with medicine, so I'm already taking a psychiatric medication, medication and therapy. Therefore, actually when the moment that happened, what I felt was the concern or worry, I felt that I was being followed or persecuted, anxiety. More or less, that's about it. Q: Okay. Now, when you, when you take your medicines that's being prescribed for you, for your mental condition, do you still have these feelings or are you basically fine as long as you take your medicine? A: Definitely. If not, I wouldn't be taking it." (Docket No. 75–7, Def. Ex. 6, p. 121.)

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *See also Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000).

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trialworthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49 (1st Cir.2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine". "Material" means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is "genuine" when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

## IV. *Discussion*

### A. *The Rehabilitation Act*

█ Mr. Roman alleges that Mr. Potter, as the titular head of the Postal Service, discriminated against him on the basis of his disability in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* The Rehabilitation Act, like its more famous sister statute, the Americans with Disabilities Act ("ADA"), prohibits discrimination against an otherwise qualified individual on the basis of his disability. As a general proposition, the case law construing the ADA applies equally to claims raised under the Rehabilitation Act. *Calero–Cerezo v. United States Department of Justice,* 355 F.3d 6, 19 (1st Cir.2004).

█ Plaintiffs bear the initial burden of proving each element of their claim for disability discrimination. *Mendez v. West,* 177 F.Supp.2d 121, 125 (D.P.R.2001). To establish a prima facie case of disability discrimination, or more specifically, for failure to accommodate under the Rehabilitation Act, a plaintiff must establish the following three elements: (1) that he suffered from a "disability" within the meaning of the Act; (2) that he was a qualified individual in that he was able to perform

the essential functions of his job, either with or without a reasonable accommodation; and (3) that despite his employer's knowledge of his disability, the employer did not offer a reasonable accommodation for the disability. *Calero–Cerezo*, 355 F.3d at 20; *Lebron–Torres v. Whitehall Laboratories*, 251 F.3d 236, 239 (1st Cir.2001).

## B. *Disability*

■■■ For the purposes of the ADA and the Rehabilitation Act, a disability is either (1) a physical or mental impairment which substantially limits one or more of an individual's major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Mr. Roman argues that he actually suffered from a physical impairment that substantially limited more than one of his major life functions. The determination of whether a plaintiff is disabled under the Act must be made on a case-by-case basis. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The analysis of whether a plaintiff has a disability within the meaning of the statute depends upon three factors: (1) whether the plaintiff suffered a physical or mental impairment; (2) whether a life activity limited by the impairment qualifies as major; and (3) whether the impairment substantially limited a major life activity. *Calero–Cerezo*, 355 F.3d at 20. The burden is on the plaintiff to establish these three elements. *Id.* Mr. Roman has successfully satisfied the first two elements, but he fails to satisfy the third.

■■■ A mental or psychological disorder, including emotional or mental illness qualifies as a physical or mental impairment. 29 C.F.R. § 1630.2(h)(2). The record demonstrates that Mr. Roman has been diagnosed with depression, bipolar disorder, and schizophrenia. All three of these diagnoses qualify as impairments. *Calero–*

*Cerezo*, 355 F.3d at 20 (recognizing that depression is a mental impairment and may constitute a disability under federal law in some circumstances); *see, Glowacki v. Buffalo General Hospital*, 2 F.Supp.2d 346, 351 (W.D.N.Y.1998) (treating bipolar affective disorder as an impairment); *Franklin v. U.S. Postal Service*, 687 F.Supp. 1214, 1218 (S.D.Ohio 1988) (recognizing schizophrenia as a potential disability). Accordingly, Mr. Roman has easily shown that he has a mental impairment.

■■■ Mr. Roman has also shown that his impairment affects a "major" life activity. The First Circuit Court of Appeals has defined major life activities as "an activity of central importance to people's daily lives." *Calero–Cerezo*, 355 F.3d at 21 (*citing Toyota Motor*, 534 U.S. at 197, 122 S.Ct. 681). The Equal Employment Opportunity Commission ("EEOC") regulations interpreting 42 U.S.C. § 12102 define major life activities as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The First Circuit Court of Appeals has also held that activities such as thinking, concentrating, and interacting with others may be reasonably subsumed within the broader context of working and learning. *Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 258 F.3d 30, 33 n. 4 (1st Cir.2001). Here, the Court feels no need to review whether every single life activity that Mr. Roman alleges is affected by his mental condition qualifies as a major life activity because the uncontroverted record is that when Mr. Roman is in crisis, he has no cognitive function. Cognitive function, in other words the ability to think, clearly qualifies as a major life activity.

■■■ Mr. Roman has been unable, however, to establish that any of the alleged major life activities affected by his mental condition are "substantially" limited. The

word substantially means "considerable" or "specified to a large degree" but it should "not be equated with utter inabilities." *Calero–Cerezo,* 355 F.3d at 21 (internal citations omitted). In addition, "if a person is taking measures to correct for, or mitigate a physical or mental impairment, the effects of those measures-both positive and negative-must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) ("A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently [sic] 'substantially limits' a major life activity.").

Despite Mr. Roman's claim to the contrary, the record clearly demonstrates that when Mr. Roman is receiving treatment and taking his medication his condition is stabilized and he can essentially function normally. Accordingly, this Court must hold that, pursuant to statute, Mr. Roman is not "substantially limited" in any of the alleged major life activities affected by his mental impairment. *See, Krocka v. City of Chicago,* 203 F.3d 507, 513 (7th Cir.2000) (upholding a jury's finding that a plaintiff with an impairment of severe depression was not disabled because the plaintiff acknowledged that he exhibits no symptoms of depression when taking medication); *Kramer v. Hickey–Freeman, Inc.,* 142 F.Supp.2d 555, 559 (S.D.N.Y.2001) (holding that a plaintiff with bi-polar disorder who testified that he did not feel disabled when taking lithium was not disabled for purposes of the ADA). Mr. Roman's repeated but temporary hospitalizations do not dictate a contrary outcome. *See, Chandler v. AMR American Eagle Airline,* 251 F.Supp.2d 1173, 1181 (E.D.N.Y.2003) ("temporary impairments of one's ability to engage in major life activities are not actionable under the ADA") (*citing Colwell*

*v. Suffolk County Police Dep't,* 158 F.3d 635, 643–44 (2d Cir.1998)). Therefore, Mr. Potter's motion for summary judgment is granted.

## V. *Conclusion*

For the reasons stated above, defendant's motion for summary judgment is **GRANTED.** The claim against John E. Potter in his official capacity is **dismissed with prejudice.** Plaintiff's motion to strike defendant's reply brief and to deem his additional facts submitted in support of his opposition to summary judgment is **GRANTED IN PART** and **DENIED IN PART.**

IT IS SO ORDERED.